IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ROIL ENERGY, LLC., a Nevada Limited Liability Company, by and through the derivative claim of ALLAN HOLMS, a married man and a Washington Resident, | ) ) ) ) ) | No. 32577-6-III |
| Appellants, | ) ) ) | UNPUBLISHED OPINION |
| v. | ) ) | |
| JOSEPH ("JAY") EDINGTON and JANE DOE EDINGTON, husband and wife and residents of Spokane County, Washington; TOLL RESERVE CONSORTIUM INC., a Nevada Corporation recently renamed as HOLMS ENERGY DEVELOPMENT CORPORATION, a Nevada Corporation; VAL AND MARI HOLMS, husband and wife, and the marital community comprised thereof, residents of the State of Montana; HOLMS ENERGY, LLC, a Nevada Limited Liability Company, and BAKKEN RESOURCES, INC., a Nevada Corporation. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

FEARING, C.J. — This appeal pits two half-brothers, Allan Holms and Val Holms,

against one another. The dispute arises from discussions between the two brothers concerning development of mineral rights owned by Val. The trial court held that the two never formed an enforceable agreement, but found that Val committed fraud, breach of fiduciary duty, conspiracy, and oppression of Allan. The trial court denied Allan an award of damages because of lack of proof of damages. We affirm the dismissal of the contract claim, but reverse the tort judgments because an element of each tort cause of action is proof of damages.

## FACTS

The business dispute on appeal lies between Allan Holms and Val Holms, half-brothers who share the same father. Allan resides in Spokane, and Val lives in Montana. When Allan and Val's father died, each inherited mineral interests located in McKenzie County, North Dakota. The interests of each brother lie on separate parcels, and Allan's mineral interests are not involved in this appeal.

Val Holms' mineral interests are the subject of this appeal. Val's interests lie within the North Dakota Bakken Oil Fields, scene of recent oil production. Val shared his mineral interests with his sister Evenette Greenfield and a cousin, with each holding a one-third interest. The interest came through Val's mother, who was not the mother of Allan. Presumably the interests are undivided, but the record does not show such. In 2009, Val Holms transferred his mineral interests to Toll Reserve Consortium, Inc., a Nevada corporation solely owned by Val.

2

Sometime in late 2009, Allan Holms met Jay Edington at a social event. Edington is a Spokane financial consultant involved in mergers and acquisitions of public companies. Edington suggested to Allan that the two work together on an investment scheme involving public "shell" companies. Contemporaneous to Edington's proposal to Allan Holms, Val Holms asked brother Allan for an $80,000 loan to open an auto body shop. During a 2009 Christmas visit in Spokane, Allan declined the loan request and suggested to Val that the two develop Val's North Dakota mineral interests instead.

Allan Holms introduced Val to Jay Edington during the Christmas holiday. During the initial meeting and in other meetings in January and February 2010, Edington proposed the utilization of a reverse merger to raise capital for development of Val's mineral interests. This court remains uneducated as to what capital the three needed to raise to exploit the mineral interests held by Val Holms, why Val would not reap more income by leasing his mineral rights to an oil company, and how Val's one-third interest could be developed without participation of the owners of the remaining two-thirds interest.

The reverse merger sought by Jay Edington entailed placing Val Holms' North Dakota mineral interests in a private entity owned by Edington and the Holms, the three acquiring a controlling interest in the shares and management of a public shell company, and then transferring the mineral interests of the private entity to the public company in exchange for the public company's shares. Edington explained that the three could more

3

easily raise capital by selling the shares of an established, but nonoperating, publicly-traded company. When the private company acquired a majority interest in the public company's stock during the asset transfer, the private company would become the controlling entity and merge into the public company.

According to Jay Edington, the reverse merger, as compared to forming a new public company, lessened the expense and decreased the time needed to raise capital. Creating a new public corporation requires filing with the Securities and Exchange Commission and completing extensive paperwork before the selling of shares commences. Edington assured Allan and Val Holms that a reverse merger would also permit transfer of the mineral rights for shares of a company free of taxation.

Allan and Val Holms respectively claim that each did not understand the reverse merger process recommended by Jay Edington. Allan and Val's imperfect understanding extended to knowing the three would form a limited liability company with Allan contributing initial funding, Val providing his mineral interests, and Edington providing the labor and expertise to procure a public shell company for the reverse merger and marketing the shell company's shares. Allan agreed to supply seed capital of from $200,000 to $250,000 and to raise two million dollars in private equity from investors who would buy shares in the public corporation.

On February 1, 2010, Jay Edington chose APD Antiquities, Inc. (APD) as the target public shell corporation for the reverse merger. Edington was the founder of and a

consultant to APD. He advised Allan Holms to purchase 2.5 million shares of APD common stock for $0.02 per share. On February 1, Edington also sent a template to Allan and Val for reverse mergers and asset purchase agreements.

The trio did not execute any written agreement, but Jay Edington outlined each party's responsibilities in a timeline chart that he presented to Allan and Val Holms on February 13, 2010. The timeline listed that Allan would submit $200,000 to the limited liability company by March 1, 2010, and Val would assign his North Dakota mineral interests to the company and record the transfer by March 8, 2010.

According to Val Holms, Allan, Edington, and he discussed numerous ownership percentages for the business venture. Val Holms consistently told others that he intended to hold the controlling interest in both the limited liability company and APD Antiquities because the value of his mineral interests exceeded the value of Allan's and Jay Edington's contributions. According to Edington, the division of ownership shares was never finalized. Allan claims the parties agreed to a 40/40/20 split in ownership.

By early February 2010, Jay Edington commenced surreptitiously e-mailing Val Holms and expressing unhappiness in Allan's participation in the venture. Val's sister, Evenette Greenfield, gained copies of these secretive e-mails and later supplied copies to Allan. In a February 3, 2010 e-mail to Val, Edington expressed irritation at Allan's greed and his desire to act as "'Big Daddy'" while Val and Edington performed the work. Ex. 82 at 1. Edington expressed worry that Allan intended to keep the equity from the APD

5

Antiquities shares he would purchase for the three or share the shares with Val without providing any shares to Edington. Edington rhetorically asked why he would invest his time, energy, and expertise to reap Allan a fortune. Edington desired a three-way split of the APD Antiquities shares.

Jay Edington recommended to Val and Allan Holms that the three men form their limited liability company, as the private entity for the reverse merger, in Nevada. On February 19, 2010, the threesome formed Roil Energy, LLC, a Nevada limited liability company that designated Edington's daughter, a Nevada resident, as the registered agent. The formation document listed Allan, Val, and Edington as managing members of Roil Energy.

Jay Edington's reverse merger plan contemplated that he, Val Holms, and Allan Holms would not be the only members of Roil Energy, LLC. Instead an additional member or members would participate to the extent of an undetermined percentage ownership interest in the limited liability company. Neither Val nor Allan Holms knew the identity of the additional member or members, and no percentage membership interest was ever assigned to those unidentified members.

On February 19, 2010, the same day as the formation of Roil Energy, Allan and Val Holms rendezvoused in Butte, Montana. Val brought copies of the two mineral deeds and told Allan the originals had been mailed to North Dakota for filing. The deeds had not been mailed or recorded and were never recorded. The mineral deeds purported

6

to transfer Val's mineral rights, through his company, Toll Reserve Consortium, Inc., to Roil Energy for $10 in consideration. Val Holms did not intend to record the deeds until Allan Holms contributed the $200,000 and performed other commitments. According to Jay Edington, the reverse merger plan anticipated the transfer of the mineral interests after the closing of an agreement, raising of needed capital, and a private stock placement. At the Butte meeting, Val handed copies of each deed to Allan.

Tom Greenfield, son of Evenette Greenfield and nephew of both Allan Holms and Val Holms, attended the meeting between Allan and Val Holms on February 19, 2010. Based on the discussion, Tom Greenfield concluded that Val would hold a majority interest in the venture.

During the brothers' Butte meeting, Allan delivered a check for $10,000 to Val to open a Roil Energy company bank account. Val later opened the account, deposited the check, and used the deposited funds to pay company bills, including his monthly salary of $6,000.

APD Antiquities, the shell target corporation, needed funds from investors to purchase the mineral interests from the limited liability company formed by Allan and Val Holms and Jay Edington. As a prelude to seeking investors for APD Antiquities, APD needed to acquire the right to purchase the mineral interests through an option to purchase agreement, so that potential investors knew that such a right existed despite the transfer of the interests occurring later. No option to purchase agreement was ever

drafted.

According to Jay Edington, a valuation of Val Holms' mineral interests was needed to effectuate the reverse merger. Presumably the potential investors in APD Antiquities would wish to know the value of the asset being transferred to the corporation. The parties sought a valuation from Boyd Hennimen, a petroleum geologist and friend of Allan Holms. Hennimen refused to prepare a valuation of the mineral interests because, for at least two reasons, a valuation would be difficult. No drilling had occurred on the subject land, and Val gained his mineral interests through a gift.

Jay Edington continued to express, to Val Holms, displeasure with Allan. In late February 2010, Edington mentioned frustration over Allan's controlling style, delay in forwarding names of nominees for the APD Antiquities stock transfers, and tardiness in transferring funds for the purchases. By late February, Val concluded that his brother intended to gain control of his mineral interests.

On February 23, 2010, Jay Edington sent Allan and Val Holms a draft letter of intent from APD Antiquities agreeing to an asset purchase agreement with Roil Energy and a draft executive summary for Bakken Resources, Inc., a new public corporation that would replace APD Antiquities. Edington requested that Allan and Val provide information for the executive summary regarding the property location, nearby oil wells, and other germane data. The Holms brothers never completed the draft summary. The parties never finalized or signed a letter of intent.

Allan Holms never contributed to Roil Energy any additional sums beyond the $10,000 of seed capital and did not raise any of the $2 million he agreed to raise from new investors. He did not approach any potential investors, other than conducting a phone conversation with an unidentified person at Morgan Stanley. Allan did, however, buy 1.3 million shares of APD Antiquities from existing shareholders at 2 to 4.5 cents per share. The purchased shares represented fifty-five percent of APD's common stock. Jay Edington and Val Holms expected Allan to share the shares.

Jay Edington arranged for the sale of APD Antiquities' shares from current shareholders. Allan Holms purchased the shares of APD Antiquities through nominees. The purpose of using nominee purchasers was to prevent any one record shareholder from holding more than 9.9 percent of the corporation's common stock. Allan Holms and Jay Edington knew that APD Antiquities stock value might, upon the reverse merger, significantly increase in value. We do not know if Allan and Edington shared this information with sellers of APD stock.

In a February 24, 2010, phone conversation, Jay Edington warned Val Holms of Allan's potential control of the venture. Edington advised Val that, if the trio completed the proposed transaction, Val would not control Roil Energy or APD Antiquities, since Allan would control 3.8 million shares of APD out of a total of 5.2 million shares outstanding. On another occasion, Edington cautioned Val that Allan insisted that Val not be involved in the APD Antiquities stock acquisition.

E-mail from Jay Edington to Val Holms, on February 24, 2010, documents the intent of the pair to withdraw from any venture involving Allan. In the first e-mail of the day, Edington expressed anger at "being jerked around by Allan." Ex. 150 at 1. Edington informed Val that Allan refused to buy corporate stock according to the deal Edington had structured and Allan refused to share the purchased stock with Val. Edington declared: "Thank God you did not send those documents [mineral deeds] in for recording." Ex. 150 at 1. Edington added: "Fortunately, there is absolutely nothing in writing at this time, so nothing legally binding that he can hang his hat on, if you decide to pull the rug out." Ex. 150 at 1. Edington recommended finding a way to "unwind this immediately and hope the fallout is not too much." Ex. 150 at 1. He suggested purchasing the remaining shares and conceiving a "logical reason" for aborting the trio's plan to develop the mineral interests. Ex. 150 at 2. Edington recommended enlisting the help of geologist Boyd Henneman, who had been consulted on the Bakken oil fields. Edington stated: "I might even go so far [as] to utilize another public company that I know about." He warned Val, however, that "[i]f Allan wires any funds or sends in checks to APD, then we are technically locked in." Ex. 150 at 2.

In a later February 24, 2010, e-mail, Jay Edington explained to Val Holms that they each must raise $25,000 to render "Plan B" feasible. Ex. 154. On February 25, Edington drafted an e-mail for Val to send Allan disclosing that Val knew about the APD Antiquities stock Allan purchased and planned to buy and asking: "Am I safe to assume

that I participate in these shares and they are being purchased for the three of us?" Ex.

160. During the evening of February 25, 2010, Val Holms e-mailed Allan Holms:

> Allan,
> Funny thing—I was just going through the time line that Jay has developed and in my rush to get my part finished with Boyd, I apparently overlooked a very important piece of the puzzle. I see that 2.5 million shares are being purchased from the company at $.02 and some additional shares from existing shareholders.
> I am very disappointed that this has not been brought to my attention. Is it safe to assume that I am participating in this transaction concerning these shares? Are they being purchased for all three of the partners or is this another one of your self-enrichment deals that does not figure me into the equation?
> Val

Ex. 161.

Brother Allan Holms responded early morning February 26:

> Thanks for the vote of confidence. It helps to discuss questions rather than make assumptions and then try to pick a fight.
> The deal has not changed and is as discussed with you numerous times, we share everything 50/50. I am currently putting up all of the money to buy the shares from existing people at from .02 to .045 cents a share. According to Jay these become free trading shares and are liquid. Supposedly I receive my cost back in the future and we share those stocks 1/3; 1/3; and 1/3. They will not even be issued in my name. The 2.5 million shares are purchased and the money goes into the company. The other shares are purchased from existing shareholders of the public company.
> I have to wire the money today. If there is going to be a concern on your part, let me know before noon when I am supposed to send the wires. Incidentally, as you know I have sailed my own ship all my life and I have given you the option of getting on that ship if you want.

Ex. 163.

11

Val Holms responded to Allan the same day:

> Sounds good to me. I was taken back by the time line and was
> wondering what the hell was going on being that you seem to be on top of
> everything and was wondering why this was not brought to my attention.
> It's not that I am trying to start a war but I have been around you long
> enough to know that nothing gets by you and it took me by surprise that it
> had not been brought up.
> Go ahead and wire the money and I will see you either late Saturday
> or Sunday. I wouldn't worry about getting your money back because it is a
> dead ringer to produce. If you are concerned I have a couple of investors
> that would be more than happy to get in on the deal in any way that they
> can. All I know is time is slipping by and it seems that you have been so
> wrapped up in your other deals that you do not have the time to concentrate
> on the project at hand, and I don't want to lose it because we are dragging
> our feet too long.

Ex. 165.

During February 2010, Jay Edington sustained communications with Allan Holms as though Edington continued with plans for the reverse merger venture to capitalize and exploit Val's mineral interests. On February 26, Edington urged Allan to wire funds for stock purchase agreements.

Two days later, Edington sent Allan and Val Holms a draft of an operating agreement for Roil Energy that he advised was "critical" to define the ownership of its managing members. He explained that the operating agreement could be dated any time after formation of the limited liability company, but, "legally speaking," Roil Energy lacked a valid agreement that established ownership interests in the company. Ex. 171. The draft agreement contained blanks wherein the respective ownership interests of the

12

members of Roil Energy would be inserted. No one ever inserted figures into the blanks. The parties never signed an operating agreement.

In late February 2010, geologist Boyd Henneman met Allan Holms, Val Holms, and Jay Edington and presented a disappointing outlook for development of mineral interests in McKenzie County, North Dakota. On March 4, Edington and Val prepared an e-mail for Val to send to Allan. Val may have spoken with Allan on the telephone before sending the message. In the sent e-mail, Val stated: "I am sorry that you have changed your mind to proceed with Bakken Resources, and I can fully understand your position in not wanting to go forward with it[,] especially after our meeting with Boyd [Henneman]." Ex. 183. Val continued: "for the time being I am going to retain my mineral rights and hope that Boyd was wrong. But I doubt it." Ex. 183.

On March 5, 2010, Allan Holms wrote Val to say that Val must have misunderstood, and that Allan still desired to proceed with the plan to develop the mineral interests. Allan suggested that they slow the process and conduct more research. Allan did not agree with Boyd Henneman's opinion and cautioned that the brothers needed to consider Jay Edington's business interests as well.

On March 5, Allan Holms also e-mailed Jay Edington about Val's plans to withdraw from the trio's venture. Edington slyly responded: "This is all news to me, but explains why I have not had any calls from Val. I think Boyd took the wind out of Val's sails and also sensitized him about public companies." Ex. 189. Ten minutes later,

13

Edington sent Val a draft e-mail to send to Allan stating that, after "soul searching," Val had decided to "step back from Bakken." Ex. 190. Edington also told Val to claim he had not talked to Edington since the last meeting. Val sent Edington's recommended e-mail to Allan and then did not respond to e-mail and telephone calls from Allan.

On March 6, 2010, Jay Edington outlined Plan B in an e-mail to Val Holms and stated that the pair should dissolve Roil Energy immediately. Edington expressed delight that Val chose "to eliminate Allan from the Bakken Resources, Inc. project." Ex. 194 at 2. Edington's steps proposed for Plan B included ceasing use of APD Antiquities as the public shell company and consummating a reverse merger with a new public company called Multisys Language Systems, Inc., already formed to market language education software. Edington's daughter created Multisys, and she no longer valued her marketing partner. Plan B further involved immediate dissolution of Roil Energy, because of Allan's partial ownership of the limited liability company. Edington wrote: "The reality is that Roil never executed an operating agreement, so it does not legally exist." Ex. 194 at 3. Plan B finally entailed purchasing all or part of Evenette Greenfield's share in the mineral interests. Edington assured Val that, under Plan B, Val would gain "absolute control" of the mineral interests company and protection from Allan's bullying. Ex. 194 at 3.

On March 7, 2010, the day after explaining Plan B to Val Holms, Jay Edington sent Allan Holms an e-mail stating that, with Val now unresponsive, Edington and Allan

14

should treat the $10,000 seed capital Allan provided to Roil Energy as a loan. Edington gave a personal guarantee to Allan that Allan would be reimbursed for all money he contributed toward the Roil Energy and APD Antiquities venture. Edington assured Allan that Edington preferred that the Roil Energy venture proceed as planned. Edington then e-mailed Val, with a copy to Allan, expressing concern that Val had not returned Edington's telephone calls. Edington declared that he had invested time in the project and wanted to know Val's thoughts. Edington then sent a private e-mail to Val that explained that Edington's previous e-mail to the brothers opened the door for Val to respond with a list of reasons why he rejected the proposed mineral interests venture. According to Edington, Val and Edington could isolate Allan, unwind Roil Energy, and "go underground" to develop a new reverse merger without Allan. Ex. 202.

Allan Holms unsuccessfully continued attempts to contact Val and to assure him Allan did not want his mineral interests. In one e-mail, Allan agreed that, if the proposed venture failed to proceed, the mineral interests would revert to Val. Val and Jay Edington prepared reasons for Val's withdrawal from the venture. In a resulting March 9, 2010, e-mail, Val explained that he wanted to hold his mineral interests to "insure the financial future of me and my family." Ex. 210. He did not wish to lose control over the mineral rights.

On March 16, 2010, Val Holms filed, in Nevada, articles of dissolution for Roil Energy, LLC, by signing only his name as a managing member. On March 18, Val sent a

letter, with an enclosed check for $10,000, to Allan. The letter read, in part: "in repayment of the loan made to Roil" and "[t]his clears up any obligations that I may have had to you regarding Roil Energy." Ex. 236 at 2. Allan negotiated the check. Val closed the Roil Energy bank account. Jay Edington repaid Allan the sum Allan spent on purchasing APD Antiquities stock.

Plan B proceeded. Val Holms and Jay Edington formed Holms Energy, LLC, transferred Val's North Dakota mineral interests to Holms Energy, and, in November 2010, completed a reverse merger with Multisys Language Systems, Inc., the public shell company. The pair renamed Multisys as Bakken Resources, Inc. Bakken Resources transferred to Holms Energy, LLC, 40,000,000 shares of Bakken Resources, Inc. stock, $100,000 cash, and a ten-year overriding royalty of approximately 29.41 percent of the gross amount of royalty payments received by Bakken Resources. By April 2013, Bakken received royalties from multiple wells producing oil and gas. Bakken Resources is now a publicly traded Nevada corporation.

Allan Holms professed shock, in spring 2011, that Jay Edington and brother Val used Val's North Dakota mineral interests to form and operate Bakken Resources. Beginning in February 2012, Allan and Edington unsuccessfully attempted a scheme whereby Allan would join the board of directors of Bakken Resources, the two would demand the resignation of Val as chief executive officer of the company, and Edington and Allan would assume control of Bakken Resources.

16

PROCEDURE

On March 14, 2012, Allan Holms sued, on his own and Roil Energy's behalf, Jay Edington, Holms Energy Development Corporation, Bakken Resources, Inc., Holms Energy, LLC, Toll Reserve Consortium, Inc., Val Holms and Mari Holms. Allan alleged breach of contract and fiduciary duties, wrongful dissolution of Roil Energy, LLC, civil conspiracy, tortious interference with a prospective business opportunity, fraud, and declaratory judgments. In amended complaints, Allan added claims of constructive trust and breach of the contract to form a joint enterprise. In July 2013, Allan and Edington filed a certificate of revival for Roil Energy that related back to the date of the LLC's formation.

The trial court dismissed on summary judgment the claim of tortious interference before trial. Allan Holms settled with Jay Edington before trial.

The court conducted a bench trial from November 4 through November 18, 2013. During trial, Jay Edington testified that, in a reverse merger scheme using an asset purchase as the strategy, the scheme follows a two-step process. First, an option to purchase the asset is prepared and executed, and then an asset purchase agreement is prepared and executed. An option to purchase is necessary to show investors in the public shell company that the company has a binding option to acquire the critical asset. According to Jay Edington, Allan, Val Holms, and he never finalized or signed an option agreement or asset purchase agreement. William F. Ross, an expert who testified on

17

behalf of Allan Holms, stated that, in the two most common types of reverse mergers, the parties need either a signed asset purchase and sale agreement or a signed merger agreement.

On December 2, 2013, the trial court issued findings of fact and conclusions of law. The court found that Val Holms did not record the mineral deeds conveying Toll Reserve Consortium's mineral interests to Roil Energy because he never received the total $200,000 Allan agreed to pay as seed money for Roil Energy. Val did not intend to record the deeds and transfer title to Roil Energy until Allan paid the $200,000 and performed his other commitments to raise capital. According to the trial court, Allan Holms never approached any potential investors as promised. The parties never agreed to their respective percentages in Roil Energy, LLC. Jay Edington contemplated additional members in the limited liability company beyond the three.

The trial court also found that the Holms brothers and Jay Edington never signed an operating agreement in Roil Energy, never signed an agreement establishing their respective ownership interests in Roil Energy, never signed a document that allocated the shares anticipated to be received from APD Antiquities, and never signed a document establishing an agreement to enter and fulfill the terms of a reverse merger. The transfer of Val Holms' mineral interests to Roil Energy was not scheduled to occur until the satisfaction of many steps and would occur on closing of the deal. The valuation of the mineral interests was necessary to the reverse merger. The raising of capital and a private

18

placement of corporate stock would precede the transfer of the mineral interests.

The trial court noted that at various times, Allan Holms, Val Holms, and/or Jay Edington discussed the two brothers sharing APD Antiquities stock equally or splitting the stock with Jay Edington with the brothers each receiving forty percent of the stock and Edington receiving twenty percent. By mid-February, Jay Edington communicated other arrangements with each brother separately.

Based on the findings of fact, the trial court concluded that Allan Holms, Val Holms, and Jay Edington never entered into an enforceable contract. Necessary terms for the entry of an agreement included the valuation of Val Holms' mineral rights, the timing, amount and form of seed capital, the timing and amount of subsequent equity investment, the percentage of ownership among Allan Holms, Val Holms, and Jay Edington, the number of members in the limited liability company, and entry of an operating agreement for Roil Energy, LLC. The parties contemplated entering many agreements before binding themselves to a joint venture. The agreements included an option to purchase Val Holms' mineral interests, an operating agreement from Roil Energy, and an asset purchase agreement for APD to acquire Val Holms' mineral interests. Because of the hidden communications and mistrust among the three, the parties never formed a common purpose, community of interest, or equal right of control.

The trial court concluded that any agreement by Val Holms to transfer his mineral interests to Roil Energy was unenforceable under the Washington statute of frauds since

19

any agreement was only oral. The trial court denied Allan any relief under a constructive trust. Because the parties never formed an enforceable contract, the trial court concluded that Val had the right to withdraw from the negotiations and to develop his mineral rights in a different transaction.

Despite the lack of an enforceable agreement, the trial court found that Val Holms uttered material false representations of fact to Allan, on which misrepresentations Allan relied when withdrawing from the project. According to the court, as a result of the misrepresentations, Allan lost the opportunity to participate in the reverse merger project as initially configured. The trial court concluded that Val committed fraud, but, due to significant differences between the proposed Roil Energy and APD Antiquities reverse merger and the completed Holms Energy and Multisys Language Systems merger, Allan lacked ascertainable damages. The court ordered only declaratory relief that Val's and Jay Edington's attempt to dissolve Roil Energy was unlawful and ineffective under Nevada law.

The trial court also concluded that Val Holms and Jay Edington committed civil conspiracy, breach of fiduciary duties, and oppression of Allan, as a minority shareholder, when Val and Edington fraudulently caused Allan to abandon his participation with Roil Energy. Again, the court limited the remedy to declaratory relief.

The trial court concluded that Allan Holms could not recover "benefit of the bargain" damages. Clerk's Papers (CP) at 4438. Nevertheless, the court stated that Val

20

might never have developed his mineral interests if Allan had not introduced Jay Edington to Val. Consequently, the court invited the parties to brief what, if any, facilitation value Allan lost by the fraudulent actions of Jay Edington and Val to exclude him from the business venture. The court warned the parties, without objection, that it would not consider new evidence.

After the hearing on damages, the trial court entered additional findings of fact and conclusions of law. The trial court found that contributions and shares of earnings are not sufficiently comparable between Allan Holms and Jay Edington to form a fair basis for damages based on a facilitation value. The trial court granted Allan and Roil Energy reasonable expenses, including attorney fees, under the Nevada Revised Statute (NRS) 86.489 for successful derivative claims of fraud, civil conspiracy, breach of fiduciary duties, and minority shareholder oppression.

In a final order, the trial court entered supplemental findings and conclusions regarding attorney fees awarded to Allan Holms. The court granted Allan Holms, under NRS 86.489, attorney fees of $399,570.50 and litigation expenses of $13,362.58.

## LAW AND ANALYSIS

Allan Holms and Roil Energy argue on appeal that the trial court misguidedly dismissed their claim for tortious interference on summary judgment, erroneously ruled after trial that the parties did not enter a binding agreement for a joint venture, mistakenly concluded that the North Dakota mineral interest deeds were unenforceable, and

incorrectly denied Allan Holms and Roil Energy damages. Val Holms cross appeals. Val contends that the trial court erred in ruling that Allan sustained tort claims, when damages are an element of the torts and Allan proved no damages. Val asks that we reverse the award of fees and costs since Allan did not sustain any tort cause of action.

## Tortious Interference

We first address the one cause of action dismissed on summary judgment. Allan Holms contends the trial court erred in granting Val's motion for partial summary judgment and thereby dismissing Roil Energy's claim of tortious interference with a business expectancy. Allan alleged that Val, Holms Energy, and Bakken Resources tortiously interfered with Roil Energy's opportunity to own and develop the North Dakota mineral interests and the interference prevented Roil Energy from benefiting from the exploitation of the minerals.

We encounter difficulty in reviewing Allan Holms' assigned error because, in his appeal brief, Allan cites to trial exhibits and excerpts from the final judgment to argue the existence of questions of fact as to his cause of action for tortious interference. Nevertheless, the trial court disposed of the cause of action before trial and based on summary judgment declarations. Allan does not outline for us the facts found in the declarations supporting and opposing the summary judgment motion and does not argue that those facts warranted denial of the summary judgment motion. For this reason alone, we deny Allan's assignment of error.

22

We must have before us the precise record reviewed by the trial court when granting summary judgment. *Harris v. Kuhn*, 80 Wn.2d 630, 632, 497 P.2d 164 (1972); *Clark v. Tacoma Hous. Auth.*, 11 Wn. App. 518, 519, 523 P.2d 1200 (1974). Allan Holms may have sent to us the precise record before the trial court on summary judgment, but we cannot be sure of such and, more importantly, Allan does not identify for us the contents of that record.

If we were to mix the facts before the trial court on summary judgment with the facts presented at trial, as Allan Holms does, we would also affirm the summary judgment dismissal of the cause of action for tortious interference on the basis that Allan showed no damages. Washington recognizes the fundamental premise that "a person has a right to pursue his valid contractual and business expectancies unmolested by the wrongful and officious intermeddling of a third party." *Calbom v. Knudtzon*, 65 Wn.2d 157, 162, 396 P.2d 148 (1964). To prove tortious interference with a business expectancy, the plaintiff must show (1) the existence of a valid business expectancy, (2) the defendant's knowledge of that expectancy, (3) the defendant's intentional interference, causing termination of the expectancy, (4) the interference was by improper means or for an improper purpose, and (5) resulting damage. *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp. Inc.*, 114 Wn. App. 151, 157-58, 52 P.3d 30 (2002), *review granted and case dismissed*, 148 Wn.2d 1021 (2003). A claim of tortious interference with a business expectancy requires a threshold showing of resulting

23

pecuniary damages. *Tamosaitis v. Bechtel Nat'l, Inc.*, 182 Wn. App. 241, 249, 327 P.3d 1309, *review denied*, 181 Wn.2d 1029, 340 P.3d 229 (2014).

We analyze below whether Allan Holms established compensable damages and conclude, as did the trial court, that he did not meet this burden. Since damages is a requisite element of the tort of interference, Allan could not sustain the cause of action even if the trial court denied the summary judgment motion and allowed the claim to proceed to trial. Although the trial court did not base its summary judgment ruling on the lack of damages, we may affirm the trial court on any ground supported by the record. *In re Marriage of Rideout*, 150 Wn.2d 337, 358, 77 P.3d 1174 (2003); *Truck Ins. Exch. v. VanPort Homes, Inc.*, 147 Wn.2d 751, 766, 58 P.3d 276 (2002).

### Findings of Fact

Val Holms contends that we must treat the trial court's findings of fact as verities because Allan did not include a separate assignment of error for each challenged finding of fact and failed to include, in his brief, the text of those findings of fact. Generally, unchallenged findings are verities on appeal. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992). RAP 10.3(a)(4) requires the appellant to provide a "separate concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error." Any challenged finding should be typed verbatim in the appellant brief's text or in an appendix to the brief. RAP 10.4(c).

Allan Holms' opening brief includes a section entitled "Assignment of Error," but he did not cite the findings and conclusions challenged in those assignments of error. He also failed to type the challenged findings verbatim. We may, however, waive compliance with RAP 10.3(a)(4) and RAP 10.4(c) in order to serve the interests of justice. RAP 1.2(c); *In re Marriage of Zeigler*, 69 Wn. App. 602, 606, 849 P.2d 695 (1993). When the nature of the challenge is clear and the challenged findings are stated in the appellant brief, the court will consider the merits. *Green River Cmty. College, District No. 10 v. Higher Educ. Pers. Bd.*, 107 Wn.2d 427, 431, 730 P.2d 653 (1986).

Our appellate record contains the trial court's findings of fact and conclusions of law. In his brief, Allan Holms identifies the findings challenged, and Val shows no prejudice with respect to a failure of Allan's noncompliance with the rules of appellate procedure. Accordingly, we review the merits of Allan's assignments of error.

Enforceable Joint Venture Agreement

Allan Holms contends that the evidence, as a matter of law, established that he and his brother entered an enforceable agreement for a joint venture. This argument omits the undisputed fact that Allan and Val did not negotiate bilaterally for an agreement to develop Val's North Dakota mineral rights. We encounter difficulty addressing Allan's contention when he fails to note the trilateral nature of the discussions. Since many, if not all, discussions assumed that Jay Edington would hold an ownership interest in the reverse merger scheme, Allan may destroy his claim of an enforceable contract by

25

omitting Edington as one of the persons needed to assent to an agreement.

The essential elements of a joint venture include (1) an express or implied contract, (2) a common purpose, (3) a community of interest, and (4) an equal right to control. *Paulson v. Pierce County*, 99 Wn.2d 645, 654, 664 P.2d 1202 (1983); *Ballo v. James S. Black Co.*, 39 Wn. App. 21, 27, 692 P.2d 182 (1984). The trial court concluded that the trial evidence did not fulfill any of the four elements of a joint venture. We are inclined to agree with the trial court. Nevertheless, we focus only on whether Allan and Val Holms entered an express or implied contract.

We assume that the general rules of contract formation apply also to the formation of a contract to enter a joint venture. The prevailing view appears to support a conclusion that ordinary contract rules apply to joint venture agreements. *Mason v. Rose*, 176 F.2d 486, 489 n.10 (2d Cir. 1949). To prove the existence of a contract, a party must show that the parties manifested to each other their mutual assent to the same bargain at the same time. *Pac. Cascade Corp. v. Nimmer*, 25 Wn. App. 552, 555-56, 608 P.2d 266 (1980). Usually "mutual assent" takes the form of an offer and an acceptance. *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 178, 94 P.3d 945 (2004). An offer is a promise to perform as stated in exchange for a return promise being given. *Pac. Cascade Corp. v. Nimmer*, 25 Wn. App. at 556. The intention to do something is not a promise to do it. *Pacific Cascade Corp. v. Nimmer*, 25 Wn. App. at 556. The terms assented to must be sufficiently definite. *P.E. Sys., LLC v. CPI Corp.*, 176 Wn.2d 198, 207, 289 P.3d

638 (2012).

The trial court entered both findings of fact and conclusions of law to the effect that Allan and Val Holms, either by themselves or in tandem with Jay Edington, never reached a binding compact. Whether the parties have mutually assented to definite terms is normally a question of fact for the fact finder. *P.E. Sys., LLC v. CPI Corp.*, 176 Wn.2d at 207. To prevail on appeal, Allan Holms must show a lack of evidence to support the trial court's conclusion that the parties never reached a binding agreement.

Allan Holms focuses on an e-mail exchange between the brothers on February 26, 2010. In a message to Val, Allan wrote, in part: "The deal has not changed and is as discussed with you numerous times, we share everything 50/50." Ex. 163. Val responded: "Sounds good to me." Ex. 165. According to Allan, these two sentences constitute a binding agreement.

In his argument, Allan Holms omits a later sentence from his February 26 e-mail to Val: "Supposedly I receive my cost back in the future and we share those stocks 1/3; 1/3; and 1/3." Ex. 163. As already indicated, the parties contemplated a tripartite agreement that included Jay Edington, not a bilateral agreement between Allan and Val. Confusion arises if Allan and Val share everything fifty-fifty, but yet stock is shared with a third party. Also, even if we found that Val and Allan agreed to this overarching concept, the agreement remains indefinite because the two never defined what constituted "everything" that they would split in half.

27

Allan Holms' legal argument particularly fails because of overwhelming evidence that the parties never reached a definitive agreement and compelling testimony that the parties did not anticipate a binding agreement until the accomplishment of many tasks. Allan Holms never approached any potential investors as promised. The parties never agreed to the percentage ownership interests of each member of Roil Energy, LLC, nor to the number of company members. The parties never executed an operating agreement for the limited liability company, although Edington drafted a proposed agreement. Val Holms always intended to hold the majority interest in any entity that owned his mineral interests, but Allan did not agree. The three businessmen never finalized or executed an option agreement or asset purchase agreement for the reverse merger. They did not draft the necessary documents for approval of a stock offering from the Securities and Exchange Commission. No one valued the mineral interests. Necessary terms for the entry of an agreement included the valuation of Val Holms' mineral rights, the timing, amount and form of seed capital, the timing and amount of subsequent equity investment, the percentage of ownership among Allan Holms, Val Holms, and Jay Edington, the number of members in the limited liability company, and entry of an operating agreement for Roil Energy, LLC.

Allan Holms argues that, in reliance on Val's objective manifestation of assent of an agreement for a joint venture, Allan gave Val $10,000 as seed money for Roil Energy and purchased $40,000 in APD Antiquities shares for the joint venture. This argument

28

assumes that the parties objectively reached an agreement. Conduct performed by Allan in conformance to discussions toward the end of an agreement never consummated does not create a binding agreement when none otherwise exists. Allan's argument also fails to note that he had promised to provide the limited liability company $200,000, not $10,000, and Val returned the $10,000. Allan also recouped the price for the APD Antiquities stock. If Allan believed the parties entered into an enforceable agreement, he should not have accepted repayment.

Allan Holms contends that a joint venture arose by implied contract. According to Allan, overwhelming and undisputed evidence showed Val's intent to enter into a contract with Allan. He relies on *Nicholson v. Kilbury*, 83 Wash. 196, 145 P. 189 (1915) for the proposition that the parties need not enter into a written partnership agreement before the court will find a joint venture relationship established. Nevertheless, *Nicholson v. Kilbury* involved an eight-year relationship between an aunt and niece, during which time the two operated many hotels. The aunt told friends and relatives that the two were partners for purposes of the business. The state Supreme Court held that, under the circumstances, a partnership was deemed established as a matter of law.

*Nicholson v. Kilbury* lacks a close relationship to our appeal. Allan and Val Holms never engaged in a business for a number of years. The Holms brothers anticipated entering numerous written agreements before consummating the joint venture. No definitive agreement was ever signed. The parties had conflicting testimony as to the

terms of the relationship. Many essential details remained unresolved.

Allan Holms principally relies on *Mason v. Rose*, 176 F.2d 486 (2d Cir. 1949), wherein the federal appeals court applied both English and California law, since the court discerned no difference between the two jurisdictions' contract principles. *Mason* aids Val, not Allan Holms. Celebrated British actor James Mason entered a written agreement with experienced motion picture executive David Rose. Under the writing, the parties agreed to form a company to produce movies starring James Mason. Among other terms of the agreement, Rose committed to manage the company, including arranging financing for, distribution of, and production of the films. The two men agreed to split the profits of the venture. The trial court found that the parties lacked an enforceable agreement. The federal district court reasoned that the venture contemplated by the writing was a substantial and ambitious project that anticipated many steps not found in the short agreement. The writing lacked details of the method of raising capital, the payment of salaries to contract players, the purchase of film stories, the payment of overhead, and the disposition and reinvestment of any profits. The Second Circuit Court of Appeals affirmed. The writing was too indefinite with respect to the parties' respective rights and obligations. The appeals court rejected David Rose's argument that an agreement creating a joint venture is in a special category and not subject to as strict test of definiteness as contracts generally. The appellate court noted that the parties had failed to define the financial arrangements for the production of films, the management needed

30

for the venture, and the services to be provided by James Mason.

This court defers to the trial court's evaluation of the credibility of the witnesses and the persuasiveness of the evidence. *Merriman v. Cokeley*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). We do not substitute our judgment for that of the trial court even if we might resolve the factual dispute differently. *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003). Substantial evidence supports the trial court's findings that Allan and Val Holms had not mutually assented to the same bargain at the same time. These findings support the court's conclusion that the brothers lacked an enforceable agreement for the joint venture. The trial court did not err.

## Mineral Deeds

Allan Holms next assigns error to the trial court's conclusion that the statute of frauds bars the enforcement of the North Dakota mineral interest deeds. According to Allan, Val's execution of the signed and notarized mineral deeds, on behalf of Toll Reserve Consortium, and delivery of those deeds to Allan passed title to Roil Energy. Val handed notarized copies of the deeds to Allan on February 19, 2010, during the Butte meeting.

We decline to address whether the statute of frauds forbids enforcement of the North Dakota mineral deeds. The trial court entered findings, supported by substantial evidence that Val Holms did not intend to transfer title of the mineral rights until a later date when Allan contributed the full $200,000 and fulfilled other promises. Therefore,

31

we agree with the trial court that there was no delivery of the mineral deeds under the law. Under this conclusion, satisfaction of the statute of frauds is immaterial. A reviewing court may affirm the trial court on any grounds established by the pleadings and supported by the record. *In re Marriage of Rideout*, 150 Wn.2d at 358 (2003); *Truck Ins. Exch. v. VanPort Homes, Inc.,* 147 Wn.2d at 766 (2002). Allan Holms agrees that North Dakota law and properly applied Washington law echo one another with regard to the subject of delivery. Therefore, we rely on Washington law.

Essential to the validity of a deed is a delivery of the instrument. *Raborn v. Hayton*, 34 Wn.2d 105, 109, 208 P.2d 133 (1949); *Martin v. Shaen*, 26 Wn.2d 346, 349, 173 P.2d 968 (1946); *Martin v. Shaen*, 22 Wn.2d 505, 512, 156 P.2d 681 (1945). Stated differently, a deed, in order to pass title, must be delivered by the grantor to the grantee. *Anderson v. Ruberg*, 20 Wn.2d 103, 107, 145 P.2d 890 (1944).

Whether there has been a valid delivery under the circumstances depends on the intention of the grantor. *Juel v. Doll*, 51 Wn.2d 435, 436-37, 319 P.2d 543 (1957); *Raborn v. Hayton*, 34 Wn.2d at 109 (1949); *Anderson v. Ruberg*, 20 Wn.2d at 107 (1944). Before the court can find a delivery, the intention of the grantor to consummate the transaction so as to fully vest the title in the grantee must be clearly shown. *Puckett v. Puckett*, 29 Wn.2d 15, 18, 185 P.2d 131 (1947). To constitute a delivery, the evidence must show that the grantor intended that the deed should pass the title at the time and that he should lose all control over the deed. *Mathewson v. Shields*, 184 Wash. 284, 288, 50

32

P.2d 898 (1935); *Showalter v. Spangle*, 93 Wash. 326, 332, 160 P. 1042 (1916). Each case, necessarily, must be decided from the standpoint of its own facts and affords but little, if any, assistance in deciding another other than as to the principles of law involved. *Anderson v. Ruberg*, 20 Wn.2d at 108.

The trial court was permitted to accept Val Holms' testimony that he did not intend to pass title to Roil Energy when handing Allan copies of the deeds. When the intention of the parties to the transaction is a controlling question, either party has the right to give direct testimony as to what his intention was at the time of such transaction. *Cannon v. Seattle Title Trust Co.*, 142 Wash. 213, 216, 252 P. 699 (1927); *Malloy v. Drumheller*, 68 Wash. 106, 117, 122 P. 1005 (1912).

In *Raborn v. Hayton*, 34 Wn.2d 105 (1949), the court cancelled a deed and quieted title to property in the heir of the grantor under the deed. The grantor, before her death, signed a deed in favor of her former husband. The attorney preparing the deed testified at trial that the grantor did not intend title to pass to the former husband until he paid the sum of $20,000. The former husband never paid the sum. After the death of the former wife, the former husband took possession of the deed and recorded it. The court annulled the deed because of the failure to pay. In our appeal, Allan Holms never paid the consideration agreed for the transfer of the mineral interests.

Val Holms delivered to Allan a copy, not the original, of the two mineral interest deeds. In *Blachowski v. Blachowski*, 135 N.J. Eq. 425, 39 A.2d 94 (N.J. Ch. 1944), the

33

grantor's agent delivered a copy of the deed to the grantee, who recorded a copy. The court, nevertheless, held that the deed did not transfer title since the grantor had no present intention to part with title. The New Jersey court observed that an essential element of delivery is the intent of the grantor that the deed shall become immediately effective as a conveyance in accordance with its terms. Even if there be a physical delivery of the document by the grantor to the grantee, the deed does not become operative if the grantor expects it not to become effective until a later final delivery.

Allan Holms characterizes Val Holms' defense as one of conditional delivery of the deeds. Allan then cites *Richmond v. Morford*, 4 Wash. 337 (1892) for the proposition that Washington does not recognize "conditional delivery." The result of *Richmond v. Morford* is consistent with Washington rejecting the rule of "conditional delivery." Nevertheless, the grantor delivered to the grantee the original of the deed, not a copy as Val delivered to Allan. The grantee, contrary to Allan Holms, had not failed to fulfill promises. Also, we note that the prevailing view now may be that a "conditional delivery" is not an effective delivery. *Turner v. Mallernee*, 640 S.W.2d 517, 522 (Mo. Ct. App. 1982); *DiMaio v. Musso*, 762 A.2d 363, 365 (Pa. Super. Ct. 2000); *McLoughlin v. McLoughlin*, 237 A.D.2d 336, 337, 654 N.Y.S.2d 407 (1997); *Lerner Shops of N.C., Inc. v. Rosenthal, Inc.*, 225 N.C. 316, 34 S.E.2d 206, 208 (1945).

Val Holms represented to Allan Holms that he recorded the deeds, but no testimony supports a finding that Val intended a transfer of title despite that

34

representation. The trial court found Val possessed no intent to transfer title until the completion of additional steps. Val Holms' false representations may give rise to a claim for fraud, but not for enforcement of the North Dakota deeds.

## Damages

The trial court found that Allan Holms proved each element of the claims for fraud, civil conspiracy, breach of fiduciary duty, and oppression of minority interest. Nevertheless, the trial court initially denied an award of damages because the structure of the proposed Roil Energy and APD Antiquities merger significantly differed from the completed Holms Energy and Bakken Resources merger. Thus, the trial court ruled that it could not award Allan damages based on a benefit of the bargain measurement. Consequently, the trial court asked the parties to brief what, if any, "facilitation value" Allan lost from the fraudulent action of Val and Jay Edington. After supplemental briefing and argument, the trial court concluded that Allan's and Jay Edington's contributions and share of earnings were not sufficiently comparable to form a fair basis for facilitation damages. Consequently, the trial court awarded Allan no damages.

Allan Holms assigns error to the trial court's failure to award damages. We review the trial court's decision regarding damages for abuse of discretion. *Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc.*, 143 Wn. App. 345, 357-58, 177 P.3d 755 (2008). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. *State ex rel. Carroll v. Junker*, 79 Wn.2d

35

12, 26, 482 P.2d 775 (1971). We will reverse a damages award only if it is outside the range of evidence, shocks the conscience, or is the result of passion or prejudice. *Mason v. Mortg. Am., Inc.*, 114 Wn.2d 842, 850, 792 P.2d 142 (1990). We find no abuse of discretion.

Generally, the measure of damages for fraud and breach of fiduciary duties is the benefit of the bargain. *Salter v. Heiser*, 39 Wn.2d 826, 831, 239 P.2d 327 (1951). But when a plaintiff seeks damages that are not inherent in the benefit of the bargain rule, he or she will be awarded damages for all losses proximately caused by the defendant's wrong. *Salter*, 39 Wn.2d at 832; *Senn v. Nw. Underwriters, Inc.*, 74 Wn. App. 408, 414, 875 P.2d 637 (1994). Uncertainty as to the fact of damage is a ground for denying liability, but uncertainty as to the quantum of damages is not fatal to a plaintiff's right to recover. *Wenzler & Ward Plumbing & Heating Co. v. Sellen*, 53 Wn.2d 96, 98-99, 330 P.2d 1068 (1958). In determining whether the evidence is sufficient to provide a reasonable basis for estimating loss, the court (1) should be exceedingly reluctant to immunize defendants due to insufficient evidence of loss, and (2) should have sufficient evidence to assess damages without speculation and conjecture. *Jacqueline's Wash., Inc. v. Mercantile Stores Co.*, 80 Wn.2d 784, 786, 498 P.2d 870 (1972). The plaintiff must produce the best evidence of loss available under the circumstances. *Jacqueline's Wash., Inc. v. Mercantile Stores Co.*, 80 Wn.2d at 787.

The trial court concluded it could not assess damages based on a benefit of the

36

bargain because the eventual structure, capitalization, and merger of the Holms Energy/Bakken Resources venture significantly differed from the original planned venture among Roil Energy, APD Antiquities, and others. In the Holms Energy/Bakken Resources merger, Bakken Resources held an option to acquire the mineral rights that did not ripen until Bakken Resources delivered $1.5 million in escrow. This second reverse merger agreement also included an overriding royalty to Holms Energy based on the revenue from the minerals and an additional payment to Val Holms of $100,000 for his mineral interests. When the parties completed the Holms Energy and Bakken Resources merger, Bakken Resources received the funds in escrow and it then issued a certificate for forty million shares to Holms Energy. Holms Energy, in turn, transferred the North Dakota mineral rights to Bakken Resources. Val received eighty percent of the forty million shares and Jay Edington garnered 20 percent of the shares. Val became the chief executive officer of Bakken.

An analysis that Allan Holms proved no damages tracks the analysis that the parties reached no enforceable joint venture agreement. Allan Holms requested damages in the amount of his expected profits from the joint venture. Allan argued at trial that, based on a forty/forty/twenty split that the parties agreed on, the court should have awarded him forty percent of the Bakken shares, forty percent of the $100,000 Bakken paid to Val for his mineral interests, and forty percent of the Holms Energy overriding royalties. These figures total $4,516,433. Nevertheless, in his appeal brief, Allan Holms

37

argues that he had an agreement with his brother for a split of fifty-fifty of the income, not a three party division of forty/forty/twenty, illustrating that even Allan's differing positions shows the lack of an agreement and an inability to assess damages. If the parties never reached an agreement, Allan was entitled to no profits. He never held an interest in the North Dakota mineral rights, such that he was entitled to royalties.

The trial court found that Allan Holms, Val Holms, and Jay Edington failed to reach an agreement about their respective ownership interests in Roil Energy and APD Antiquities. Moreover, the three participants never valued the North Dakota mineral rights and never discussed an override royalty payable to Roil Energy. Allan and Edington insisted, during trial testimony, that the parties agreed that Allan, Val, and Edington would split ownership of Roil Energy and APD Antiquities forty/forty/twenty. Nevertheless, Val testified that the parties never allocated the shares, and he insisted he always intended to retain fifty-one percent. The parties also intended to include other members in Roil Energy with an undetermined percentage of ownership interest. Exhibits showed that Edington's fear, in early February 2010 that the Holms brothers would deny him any shares of Roil Energy. Later that month, when Val inquired if he would garner any share of APD Antiquities, Allan responded that the two brothers would "share everything 50/50." Ex. 163. In the same e-mail, however, Allan discordantly wrote that the three partners would respectively receive one third of APD Antiquities. Neither Allan nor Val furnished information for the proposed operating agreement, which

38

data would have defined the ownership interests of the managing members. Based on the trial testimony, the trial court wisely ruled that Val's testimony was more credible and that the evidence established that the three participants reached no agreement. In turn, the trial court reasonably ruled that it could not discern what, if any, benefits or income Allan would have reaped if he had not been defrauded. Stated differently, the trial court was within its discretion in ruling that Allan failed to prove damages resulting from the fraud, conspiracy, breach of fiduciary duty, and oppression of minority interest. This conclusion is bolstered on the recognition that Val need not have defrauded Allan in order to terminate discussions with Allan regarding development of the mineral rights.

Allan Holms underscores his expert's testimony that the original trio's reverse merger plan replicated the final structure of the Holms Energy/Bakken Resources merger. This testimony does not assist Allan since the parties never agreed to the original reverse merger plan. Also, the trial court heard evidence contrary to the expert's testimony.

Allan Holms also argues that he was entitled to a facilitation value because he introduced Jay Edington to Val. Allan notes that Edington's share of the Holms Energy/Bakken Resources venture was 7.9 million shares, which Allan contends is the value Val assigned to Edington's participation in the new scheme. Allan asserts that he is entitled to the value of those shares of approximately $1,975,000, minus the $200,000 Allan agreed to invest in the original venture, for a total of $1,775,000.

The trial court reasonably concluded that the contributions and share of earnings

are not sufficiently comparable between Allan Holms and Jay Edington to form a fair basis for damages and denied recovery. Therefore, we hold that the trial court did not abuse its discretion in denying damages for facilitation.

Allan Holms emphasizes the trial court's finding of fact 28, in which the court, in part, found "sufficient evidence of a direct loss suffered by Allan Holms." CP at 4438. From this finding, Allan argues that he must be granted some damages. Nevertheless, the finding was a precursor to the trial court allowing Allan to argue that he was entitled to recover damages for facilitating the contact between Jay Edington and Val Holms. In the end, Allan proved no facilitation damages.

On appeal, Allan Holms complains that the trial court refused to allow him to present additional evidence to support an award based on facilitation value. Nevertheless, he never objected to the trial court's announcement that it would not entertain additional evidence. He never asked to reopen his case for presentation of new evidence. Therefore, he waived this assignment of error. Generally, issues not raised in the trial court may not be raised for the first time on appeal. RAP 2.5(a); *State v. Nitsch*, 100 Wn. App. 512, 519, 997 P.2d 1000 (2000).

Allan Holms cites no case wherein a court awards damages to a party for introducing two parties who eventually form a successful business relationship and exclude the first party from an interest in the business. Nor do we find a decision, wherein a court granted damages to a claimant under these circumstances.

40

We question whether the trial court even needed to employ a sophisticated analysis as to whether the operation of Holms Energy and Bakken Resources replicated any agreement reached by Jay Edington, Allan Holms, and Val Holms, or any agreement contemplated by them. Allan Holms failed to meet the conditions of selling APD Antiquities stock and tendering $200,000 such that Val Holms had any obligation to part with any mineral rights. If Val never became obligated to transfer any mineral interests to Allan, Allan was never injured by Val's traitorous behavior.

## Constructive Trust

Allan Holms contends that the trial court also erred in refusing to impose a constructive trust on some of the profits of the Holms Energy/Bakken Resources venture. Allan argues a constructive trust is the appropriate remedy in equity when a defendant intentionally interfered with the plaintiff's business relationship and thereby acquired the property that was the subject of that relationship. The trial court concluded that this remedy was not available because any income of Bakken Resources and Holms Energy was based on a different corporate structure than the joint venture Allan hoped to enter. Nevertheless, according to Allan, without his involvement in the Roil Energy project, Val would have never capitalized his mineral rights into a going venture worth in excess of $14,000,000 plus annual lease royalties.

A constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if

41

he were permitted to retain it. *Baker v. Leonard*, 120 Wn.2d 538, 547-48, 843 P.2d 1050 (1993); *Dave Johnson Ins., Inc. v. Wright*, 167 Wn. App. 758, 773, 275 P.3d 339 (2012). A court can impose a constructive trust arising in equity when clear, cogent, and convincing evidence serves as the basis for the decision. *Baker v. Leonard*, 120 Wn.2d at 547. The primary purpose of a constructive trust is to prevent unjust enrichment. *Consulting Overseas Mgmt., Ltd. v. Shtikel*, 105 Wn. App. 80, 87, 18 P.3d 1144 (2001).

Val Holms always owned the mineral interests in the North Dakota property during the time that Val and Allan discussed a joint venture. Allan never tendered the $200,000 needed to participate in the venture. The parties never reached an agreement. The trio of Val Holms, Allan Holms, and Jay Edington kept shifting allegiances in order to isolate another, including isolating Val. On these grounds alone, the trial court reasonably concluded that Allan has no just entitlement to any of the income from the mineral rights. We deny all assignments of error in Allan Holms' appeal.

Fraud, Conspiracy, Fiduciary Breach, and Oppression of Minority

We begin our review of Val Holms' cross appeal. Val first argues that the trial court erred when it declared him to be liable in fraud, civil conspiracy, and breach of fiduciary duty when damages is an element of each cause of action. We agree.

A claim for fraud fails as a matter of law if the plaintiff fails to prove all nine of its essential elements. *Brummett v. Washington's Lottery*, 171 Wn. App. 664, 675, 288 P.3d 48 (2012). The ninth element of fraud is "resulting damages." *Brummett v.*

42

*Washington's Lottery*, 171 Wn. App. at 675. As with a fraud claim, a claim of civil conspiracy also requires the element of damages. *Platts v. Platts*, 73 Wn.2d 434, 438, 438 P.2d 867 (1968). Finally, proof of damages is an essential element of a claim of breach of fiduciary duty. *Senn v. Nw. Underwriters, Inc.*, 74 Wn. App. at 414 (1994); *Interlake Porsche + Audi, Inc. v. Bucholz*, 45 Wn. App. 502, 509, 728 P.2d 597 (1986); 29 DAVID K. DEWOLF, WASHINGTON PRACTICE: WASHINGTON ELEMENTS OF AN ACTION § 12:1, at 365-66 (2015-16 ed.).

Val Holms also contends that damages are an element of a cause of action for oppression of a minority shareholder. Nevertheless, a minority owner's claim for oppression arises from the majority owner's fiduciary duties. *Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 670 (Iowa 2013); *McLaughlin v. Schenk*, 2009, UT 64, 220 P.3d 146, 156; *Hayes v. Olmsted & Assocs., Inc.*, 173 Or. App. 259, 21 P.3d 178, 181 (2001); *Hollis v. Hill*, 232 F.3d 460, 470 (5th Cir. 2000) (applying Nevada law). A cause of action for oppression could be considered a species of breach of fiduciary duty. Allan Holms cites no Nevada law to the contrary. Because an action for shareholder oppression is linked to a breach of fiduciary duty, we hold that damages is an element of the cause of action for oppression of a minority owner.

Allan Holms argues that an action in fraud is valid even though the injury lacks a compensable market value and cites *Sigman v. Stevens-Norton, Inc.*, 70 Wn.2d 915, 921-22, 425 P.2d 891 (1967) for this proposition. Whereas, such may be true, the claimant

43

must still prove some damages as confirmed in *Sigman v. Stevens-Norton, Inc.*, 70 Wn.2d at 921.

Allan Holms failed to prove that he suffered any damages. Accordingly, his causes of action for fraud, breach of fiduciary duty, oppression of minority owner, and conspiracy should have been dismissed. The trial court also erred when entering a declaratory judgment that Val Holms committed fraud, conspiracy, breach of fiduciary duty, and oppression, since damages are integral to the causes of action.

In response to Val Holms cross appeal, Allan distinguishes between the meaning of the words "damage" and "damages." "Damage" means legal injury, while "damages" is the monetary compensation for such legal injury. *Gilmartin v. Stevens Inv. Co.*, 43 Wn.2d 289, 302, 261 P.2d 73, 266 P.2d 800 (1954) (Schwellenbach, J., dissenting). According to Allan, the trial court's unchallenged findings support a conclusion that he suffered damage due to Val's fraud, conspiracy, breach of fiduciary duties, and oppression of minority interest and he need only prove damage, not damages, to sustain his tort theories. Unfortunately for Allan, his citation of a dissenting opinion helps him none. Washington courts have never adopted Justice Schwellenbach's distinction, in his dissenting opinion in *Gilmartin*, between "damage" and "damages."

## Attorney Fees

Val Holms contends that, because his brother failed to sustain any cause of action, Allan is not the prevailing party on any claim, and Allan may not be awarded any fees

and costs. We agree.

The trial court awarded Allan Holms partial reasonable attorney fees and costs under a Nevada statute, NRS 86.489 that applies to shareholder derivative actions. Roil Energy was formed in Nevada. The statute declares:

> If a derivative action is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct the plaintiff to remit to the limited-liability company the remainder of those proceeds received by the plaintiff.

NRS 86.489. The statute does not aid Allan because he was not successful on any of his claims and he recovered nothing.

Allan Holms also asks for an award of reasonable attorney fees and costs on appeal. Because he does not prevail on any claim on appeal, we deny the request.

## CONCLUSION

We affirm the trial court's dismissal of Allan Holms' and Roil Energy's claims for tortious interference with business expectancy and breach of contract. We concur with the trial court that Allan Holms proved no damages. We reverse the trial court's judgments for fraud, breach of fiduciary duties, civil conspiracy, and oppression of a minority shareholder, and we vacate the trial court's order of reasonable attorney fees and costs in favor of Allan Holms.

A majority of the panel has determined this opinion will not be printed in the

45

No. 32577-6-III
*Roil Energy v. Edington*

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Siddoway, J.